This document was signed electronically on October 16, 2015, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated: October 16, 2015



_____
ALAN M. KOSCHIK
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 10-55181 |
| BRIAN MICHAEL AND KRISTINA LEE | ) | |
| ALVARADO, | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | Judge Alan M. Koschik |
| | ) | |

**MEMORANDUM DECISION REGARDING DEBTORS' MOTION
FOR ENTRY OF AN ORDER DEEMING PLAN TO BE FULLY PERFORMED;
FOR AN ORDER CEASING PAYROLL DEDUCTIONS; AND FOR AN ORDER
DIRECTING CHAPTER 13 TRUSTEE TO PREPARE AND FILE SUCH FURTHER
ITEMS AS NECESSARY FOR THE DEBTORS TO BE GRANTED A DISCHARGE**

## INTRODUCTION

The matter before the Court is the Debtors' Motion for the Entry of an Order Deeming Plan to Be Fully Performed [docket #85] (the "Motion"). In the Motion, the Debtors allege that (1) their Plan should be deemed complete; (2) the payroll deductions should cease; and (3) the Court should direct the Chapter 13 Trustee to prepare and file all necessary papers so that the

Debtors may be granted a discharge. The Debtors' argue that the Plan only required 60 payments of $694, which totals $41,640. The Debtors contend that they were entitled to prepay their Plan and that they have now overpaid.

On November 3, 2014, the Chapter 13 Trustee (the "Trustee") filed his Objection to the Debtors' Motion [docket #86] (the "Objection"). The Trustee, relying on Sixth Circuit case law *Baud v. Carroll (In re Baud)*, 634 F.3d 327 (6th Cir. 2011), argues that above-median debtors, such as the Debtors, are subject to a five-year commitment period pursuant to Section 1325(b) of the Bankruptcy Code. The Trustee also contends that the five-year commitment period is mandatory unless the Debtors pay 100 percent dividend to unsecured creditors.

Contending that this requirement is temporal in nature and is not dependent upon the amount paid into the plan, the Trustee further argues that the Debtors have not met this requirement as they have not been in bankruptcy for the requisite number of months. Therefore, the Trustee asks that the Motion be denied.

The court held a preliminary hearing on the contested matter on December 4, 2014. Prior to this hearing, the Debtors filed their Memorandum in Support of their Motion [docket #89]. At the hearing, the Court directed the parties to file supplemental briefs in support of their pleadings and joint stipulations. On December 16, 2014, the Court entered a Brief Scheduling Order [docket # 91] memorializing the deadlines for the submission of pleadings related to the contested matter.

The parties fully complied with the Brief Scheduling Order and timely filing their joint stipulations of facts and the respective supplemental briefs. Upon receipt of all of the pleadings, the Court took the matter under advisement.

## JURISDICTION

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(1) and (b)(2)(A). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## FACTS

On October 30, 2010, the Debtors, Brian and Kristina Alvarado (the "Debtors"), filed a petition for relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301, *et seq*. Simultaneously with the petition, the Debtors filed their Chapter 13 plan [docket #2] (the "Plan"). Their proposed Plan was a "pot plan," meaning that it did not propose a specific percentage dividend to unsecured creditors. Instead, in their Plan, the Debtors agreed to pay the unsecured creditors a pro rata share of the plan payments net of administrative expenses.[1] The Plan payments defined by the Plan were stated as follows:

> The debtor(s) shall pay to the chapter 13 trustee all projected disposable income in the amount of $694.00 each month for approximately 60 months, but not to exceed 5 years. Unless allowed unsecured claims are paid 100%, the duration of the plan shall be . . . 5 years . . . . This provision does not prohibit the debtor from prepaying the plan before the . . . 5 year period.

On January 21, 2011, the Court entered an order confirming the Plan [docket #25] (the "OCP"). The OCP provided, *inter alia*, that the Plan was incorporated into the OCP and to the extent there were any inconsistencies between the Plan and the OCP, the OCP would control. (OCP, decretal ¶2). It also provided that "[T]he Debtor is under a continuing obligation to … disclose all income and assets [to the Trustee]." (*Id.* ¶11 at 2). In addition, the OCP also

---

[1] The Debtors scheduled no secured or unsecured priority claims in their Petition. Nor were any such claims registered.

3

required the Debtor "to devote all future disposable income to the Plan as required by Sections 1322(a)(1) and 1325(b)(2)." (*Id.*, Responsibility of the Debtor ¶1 at 2).

Over the course of the next four years, the Debtors made their monthly plan payments to the Trustee. In addition, each year Mr. Alvarado received annual wage bonuses. The Debtors had informed the Trustee at the initial Section 341 meeting of creditors that Mr. Alvarado expected to receive variable annual wage bonuses of approximately $1,200 per year. On the Trustee's 341 examination sheet, the Debtors agreed to inform the Trustee of any and all wage bonuses received and the amount of each bonus. This was signed by the Debtors and their counsel. In fact, the Debtor husband did earn annual wage bonuses for 2011-2014 in excess of the anticipated $1200 per year. It is unclear to the Court whether the parties reached a compromise that required the Debtors to turn over one-half of the bonuses to the Trustee or whether the Debtors turned over a larger portion of the bonuses, or even all of them. The parties stipulated that during these four years, the Debtors turned over to the Trustee aggregate bonus proceeds ranging from $9,542.93 to $10,197.57.[2] Inexplicably, neither party -- Debtors nor Trustee -- addressed the impact of the bonus payments at the times they were made. The Debtors sought no assurances that these payments would be applied in such a manner to prepay their

---

[2] In the Joint Stipulations of Fact filed by the parties at docket #92, the parties state that the Debtor husband received at least $9,542.93 in supplemental bonus income from his employer and that the Debtors have turned over that same amount to the Chapter 13 Trustee in addition to the monthly Plan payments. However, the Exhibit A attached to the Joint Stipulations of Fact, which is incorporated into the Joint Stipulations, lists all of the Plan payments and appears to include annual payments much larger than the monthly payments, from a different source (identified as "PC"), which when totaled adds up to the figure of $10,179.57. Furthermore, the Trustee's Reply Brief at docket #94 states that the Debtor did turn over that larger amount, and refers to it as one-half of a total amount of wage bonuses of $20,359.14 as to which the Debtor husband had the "good fortune of earning." It is unclear to the Court, and the Court makes no specific findings of fact, as to whether the Debtors paid bonus proceeds over to the Trustee in the amount of $9,542.93, or $10,179.57, or some other number. In addition, the Court makes no findings as to whether these payments constituted 50 percent of the bonuses earned by the Debtor husband during the pendency of the Plan, or whether it totals the entire amount of those bonuses, or some other percentage.

Plan. The Trustee failed to clarify his position that the bonus funds were additional disposable income that would increase the pot, not curtail the Debtors' 60 monthly payments. The parties' inaction allowed this ambiguity to linger for years and has put the Court in the difficult position of imposing clarity on a situation that is now inherently foggy.

## DISCUSSION

This case has presented difficult issues for the Court. This is true in large part because the parties -- the Debtors and the Trustee -- have allowed circumstances to proceed over the course of four years or more without any effort to clarify, whether by agreement or by court order, what the Debtors' Plan means in connection with the underlying circumstances. The Debtors have paid at least $9,542.93, and as much as $10,179.57,[3] into the Plan from the Debtor husband's annual bonuses without seeking a timely, contemporaneous understanding as to whether those payments were contributions to the Plan in addition to the monthly payments of $694, or whether they essentially prepaid the Plan. Now, after four years of plan payments, including the bonus payments, the Debtors are seeking what amounts to a declaratory judgment that their Plan is complete. The very fact that the Debtors feel obligated to seek such declaration suggests that their Plan is ambiguous. Perhaps if the Debtors' intentions were more clearly made in the Plan, the Trustee would have had an opportunity to timely object to confirmation of the Plan on the grounds that it failed to comply with Section 1325(b) thereby, avoiding the need for the Court to impose clarity at this juncture in the Debtors' case.

---

3   *See* note 2, *supra*.

5

**A.     It Is Too Late To Apply Plan Confirmation Standards Under Section 1325(b) To Resolve This Case and This Motion Because the Plan Has Already Been Confirmed**.

Strictly speaking, most of the Trustee's arguments about the temporal requirement of a Chapter 13 plan -- *i.e.,* that a debtor cannot prepay and cut short a plan prior to the end of the applicable commitment period (unless the debtor is paying unsecured creditors 100 percent of their claims) -- is a confirmation issue. *Baud v. Carroll (In re Baud)*, 634 F.3d 327 (6th Cir. 2011. "If the Trustee . . . objects to confirmation of the plan, then the court may not approve the plan unless, *as of the effective date of the plan* . . . (B) the plan provides that all of the debtor's *projected* disposable income to be received in the applicable commitment period . . . will be applied to make [plan] payments." 11 U.S.C. § 1325(b)(1)(B) (emphasis added).  As the Debtors' argue, it is too late to consider whether the Plan, as written, should be confirmed.  It has already been determined:

- What is or is not the Debtors' "projected disposable income."

- Whether the applicable commitment period is 3 years or 5 years.

- Whether the Debtors are required to devote all disposable income projected at the time of confirmation, or all actual disposable income, or some other calculation, for the applicable commitment period.

- Whether prepayments may be allowed to reduce obligations under the Plan, and under what circumstances.

- Whether prepayments apply to a fixed monetary sum to be paid under the Plan, or whether they merely apply against a theoretical 100 percent dividend to unsecured creditors in order to permit an early termination of the Plan.

The time for objecting to the Debtors' Plan pursuant to Sections 1322 and 1325 (or other provisions of Chapter 13) has passed.  The Debtors' Plan was confirmed with a five-year commitment period.  The Plan payments were defined.  A confirmation order (the previously defined "OCP") was entered and remains in force.  The Plan is what it is, regardless of any second-guessing about whether it should have been confirmed in the first place.  *See United*

6

*Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 130 S. Ct. 1367 (2010). The confirmation issues raised by the Trustee are extremely important, both in general and in this case. To the extent they had been raised at confirmation, it is quite possible that the current disputes and potential for dashed expectations could have been avoided.

In order to resolve the Motion, however, the Court must address a more important and pressing question: What does the confirmed Plan mean?

**B.  Debtors' Plan, Combined With the Confirmation Order, Obligates the Debtors to Devote All Disposable Income to the Plan.**

    1.    <u>Interpretation of the Plan and the Confirmation Order</u>.

The Plan alone is not a model of clarity on the question before the Court, namely whether the bonus payments were prepayments on the amounts due under the monthly payment schedule or whether they were additional payments required to increase the dividend to the unsecured creditors in this "pot" plan. The Plan provides that the Debtors "shall pay to the Chapter 13 Trustee all projected disposable income in the amount of $694.00 each month for approximately 60 months." (Plan ¶1 at 1). The OCP confirms that the Debtor shall make those payments. "Furthermore, the Debtor agrees to devote all future disposable income to the Plan as required by the Bankruptcy Code Sections 1322(a)(1) and 1325(b)(2)." (OCP, Responsibilities of Debtor ¶1 at 2). The OCP is a form order that has been uniformly used by this Court for some time and should be well-known to the parties' counsel.

The OCP further provides that the "Plan is incorporated into this OCP as if fully rewritten herein, provided, however, that should there be any inconsistencies between the Plan and this OCP, this OCP shall control." (OCP ¶2 at 1). A reasonable interpretation of the Plan and the OCP together is that all disposable income, not merely the projected monthly payments and not excluding the annual bonuses, were due to be paid to the Trustee. Moreover, since the Plan was

a "pot" plan, the dividend to unsecured creditors would be expected to adjust upward without a motion to modify the plan.

The Plan also provides that (i) unless unsecured creditors are paid a 100 percent dividend, the duration of the Plan would be five years (if Debtors were above median income, as they are); and (ii) the Debtors are not prohibited from prepaying their Plan early. The juxtaposition of these two provisions create an ambiguity as to whether the prepayment is conditioned on a 100 percent dividend, or whether the right to prepay could truncate the commitment period. Taken alone, these provisions could have been, and in fact were, read differently by different parties. However, as the Trustee notes, this Plan was drafted by the Debtors' counsel and is not the form plan offered by the Trustee on his website.[4] In addition, the Trustee's interpretation that the five-year commitment period could be cut short with prepayments only with a 100 percent dividend to the unsecured creditors is a plausible interpretation of the Plan's ambiguous language.

The Plan is essentially a multi-party contract governing the reorganization of the Debtors' finances and adjusting the debts owed to a range of creditors. Ambiguities in contracts are construed against the drafter. *Royal Ins. Co. of America v. Orient Overseas Container Line Ltd.*, 525 F. 3d 409, 423 (6th Cir. 2008). This creates an incentive for the drafter to be as clear as possible. In this context, it is particularly important because the Code requires confirmation only after parties, including the Trustee, have an opportunity to object.

In their Reply Memorandum [docket #98], the Debtors dismiss the Trustee's ambiguity argument stating that the ambiguities are simply "things about which the Chapter 13 Trustee disagrees." (Reply Memorandum at 2). The Court disagrees with the Debtors and agrees with

---

[4] The fact that the Trustee offers a plan form on his website does not suggest that that plan form is currently favored in any way by this Court. However, the origin of the form of a plan is relevant as to authorship.

8

the Trustee. While the Trustee could have detected and raised the issues regarding the ambiguities earlier, the fact is that the Plan's provisions are not clear, especially when considered in light of the legal standards for confirmation discussed in greater detail below.

The Debtors' Plan is full of confusing, conditional boilerplate statements that appear to cover all contingencies instead of clearly stating the terms for *these* Debtors in *this* case. This style invites uncertainty and dispute. If the Plan clearly stated that bonuses were not projected income and would not be included in the Plan even if they arose, that only the sum of $41,640.00 was due under the Plan regardless of actual disposable income, and that amount could be prepaid by the Debtors to terminate the Plan prior to the five-year applicable commitment period even if unsecured creditors received less than a 100 percent dividend, then the Trustee would have had a clear opportunity to object. If the Trustee had failed to do so under those circumstances, then the Debtors would have had a stronger argument for their interpretation of the Plan and its enforcement here. No drafting party, including the Debtors here, should be allowed to "hide the ball" when drafting a plan or contract, whether intentionally or not.

Moreover, the OCP, which controls whenever inconsistencies arise with a corresponding plan, imposes clarity the Plan lacked. All disposable income of the Debtors was devoted to the Plan. The Debtors had a continuing duty to report actual income to the Trustee. These provisions required the Debtors to report additional income and devote that additional income (subject to increases in legitimate deductible expenses) to the Plan during the course of the commitment period.

    2.    <u>The Sixth Circuit's Confirmation Standards Supports the Trustee's Interpretation of the Plan</u>.

While the governing law of plan confirmation, including *Baud v. Carroll (In re Baud)*, 634 F.3d 327 (6th Cir. 2011), does not apply directly at this juncture, because the Debtors' Plan

9

has long been confirmed, it does provide the hypothetical grounds for the Trustee or a creditor to object to the Plan as the Debtors' interpret it. In other words, had the Plan unambiguously proposed the terms the Debtors now assert it had, the logic and statutory interpretation suggested by *Baud* would have almost certainly resulted in an objection to confirmation. In this sense, *Baud* informs the Court how it must interpret the Plan in light of its ambiguities. Indeed, *Baud's* interpretation of the standard for plan confirmation under the Code -- whether in its dicta or in its holding -- is consistent with the Court's interpretation of the Plan and OCP alone, thereby reinforcing the outcome here.

Pursuant to *Baud*, Chapter 13 plans cannot be crammed down over a Trustee's objection without paying all projected disposable income over the course of the commitment period. The Debtors here did disclose to the Trustee that bonuses were common and expected, although the evidence suggests that the actual bonuses were a bit larger than expected in most of the years. In addition, Plans cannot be curtailed for a period shorter than the commitment period unless the unsecured creditors receive 100 percent dividend.

*Baud* notes that the Supreme Court decision in *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 131 S. Ct. 716 (2011), preferred interpretations of the statute that serve "BAPCPA's core purpose of ensuring that the debtors devote their full disposable income to repaying creditors." *Ransom*, 562 U.S. at 78. In reaching its holding that Section 1325(b) imposes a temporal requirement for a debtor's Chapter 13 plan payments, *Baud* observed that this holding "avoids the 'senseless result [ ] that we do not think Congress intended' of 'deny[ing] creditors payments that the debtor could easily make' if additional disposable income were to become available after confirmation." *Baud*, 634 F.3d at 343 (*quoting Hamilton v. Lanning*, 560 U.S. 505, 520, 130 S. Ct. 2464 (2010)). In interpreting *this* Plan, in conjunction with the OCP in *this*

*case*, the Court is comfortable following the interpretation of the Sixth Circuit and the Supreme Court suggesting that Chapter 13 debtors must utilize their actual disposable income that becomes available during the commitment period to repay their creditors as much as possible.[5]

## CONCLUSION

For the reasons set forth in this Memorandum Decision, the Motion will be **DENIED**. The Debtors remain obligated to complete their sixty-month Plan, including devoting all their disposable income to the Plan, including all future bonuses that are earned during the commitment period, subject to adjustment for changes in their deductible expenses that may also affect their disposable income. The Debtors' payroll deductions shall resume. To the extent the Plan payments have been suspending during the pendency of the Motion, the Debtors shall be allowed additional time to complete their remaining plan payments.

A separate order consistent with this Memorandum Decision will be entered contemporaneously herewith.

# # #

---

[5] The issues regarding the binding effect of a plan, and the balance between confirming a plan consistent with *projected* disposable income pursuant to Section 1325(b), on the one hand, and maximizing the return to creditors based on the *actual* disposable income of the debtors during their plan commitment period, on the other, remains a complex issue fraught with potential arguments on all sides. The precedential value of this Decision is limited by the peculiar ambiguities of the Plan, the OCP, and the procedural posture in which this Motion arose.